IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Lucas Chadwick Taylor, | ) | Civil Action No. 8:15-1989-BHH-JDA |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court for a Report and Recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., and Title 28 U.S.C. § 636(b)(1)(B).[1]  Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security ("the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB").  For the reasons set forth below, it is recommended that the decision of the Commissioner be reversed and remanded for administrative action consistent with this recommendation, pursuant to sentence four of 42 U.S.C. § 405(g).

**PROCEDURAL HISTORY**

On March 20, 2012, Plaintiff filed an application for DIB beginning October 10, 2008. [R. 188–89.]  Plaintiff, through his representative at the hearing, amended the alleged onset date of disability to March 7, 2011. [R. 36–37.]  The claim was denied initially and upon reconsideration by the Social Security Administration ("the Administration").  [R.

---

[1] A Report and Recommendation is being filed in this case, in which one or both parties declined to consent to disposition by a magistrate judge.

80–95.]  Plaintiff filed a request for hearing before an administrative law judge ("ALJ"), and

on January 30, 2014,  ALJ MaryJoan McNamara conducted a hearing on Plaintiff's claims.

[R. 30–68.]

On  February 27, 2014, the ALJ issued her decision, finding Plaintiff not disabled.

[R. 10–25.]  At Step 1[2], the ALJ found Plaintiff met the insured status requirements of the

Social Security Act ("the Act") through March 31, 2013, and had not engaged in substantial

gainful activity during the period from his amended alleged onset date of March 7, 2011,

through his date last insured of March 31, 2013.   [R. 12, Findings 1 & 2.]  At Step 2, the

ALJ found Plaintiff had one severe impairment of degenerative disc disease ("DDD")

through March 31, 2013.  [R. 12, Finding 3.]  The ALJ also found Plaintiff had non-severe

impairments of depression and anxiety; and, the ALJ found Plaintiff had non-medically

determinable alleged impairments of persistent vomiting, abdominal pain, hematuria, and

other gastrointestinal/digestive complaints.  [R. 12–15.]  At Step 3, the ALJ determined

Plaintiff's impairments or combination of impairments did not meet or medically equal the

severity of one of the listed impairments.  [R. 15, Finding 4.]

Before addressing Step 4, Plaintiff's ability to perform her past relevant work, the

ALJ found that Plaintiff retained the following residual functional capacity ("RFC"):

> After careful consideration of the entire record, I find that,
> through the date last insured, the claimant had the RFC to
> perform light work as defined in 20 CFR 404.1567(b), lifting
> and/or carrying 20 pounds occasionally and 10 pounds
> frequently. He could occasionally stoop, bend, kneel, crouch
> and crawl.  He would have required a sit/stand work option,
> such that he could shift positions at least every 45-60 minutes.

---

[2]The five-step sequential analysis used to evaluate disability claims is discussed in the
Applicable Law section, *infra*.

[R. 16, Finding 5.]  Based on this RFC, the ALJ determined Plaintiff was unable to perform his past relevant work as a sales person, laborer (landscape), marble finisher, construction worker II, and bellhop.  [R. 23, Finding 6.]  However, in light of Plaintiff's age, education, work experience, RFC, and the testimony of a vocational expert, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed.  [R. 24, Finding 10.]  Thus, the ALJ found that Plaintiff had not been under a disability, as defined in the Act, at any time from March 7, 2011, through March 31, 2013.  [R. 24, Finding 11.]

Plaintiff filed a request for review of the ALJ's decision with the Appeals Council, which denied review on March 9, 2015.  [R. 1–5.]  Plaintiff commenced an action for judicial review in this Court on May 12, 2015.  [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff contends the ALJ's decision is not supported by substantial evidence and contains multiple legal errors warranting the reversal and remand of the case.  [*See* Doc. 15.]  Specifically, Plaintiff contends the ALJ

1.  failed to properly assess all of Plaintiff's physical and mental impairments and to properly assess the impact of these impairments in the RFC [*id*. at 19–23];

2.  failed to properly assess and weigh medical opinion evidence from Dr. Tammy Chen ("Dr. Chen") [*id*. at 26–30]; and,

3.  failed to properly evaluate Plaintiff's degenerative disc disease under the criteria of Listing 1.04 [*id*. at 30–34].

The Commissioner contends the ALJ's decision should be affirmed because there is substantial evidence of record that Plaintiff was not disabled within the meaning of the Act.  [*See* Doc. 16.]  Specifically, the Commissioner contends

1.     substantial evidence supports the ALJ's finding that Plaintiff's mental impairments were not severe and that Dr. Chen's unexplained opinions overstated Plaintiff's limitations [*id*. at 12–16]; and,

2.     Plaintiff failed to provide evidence to support a finding that the criteria of Listing 1.04 was met [*id*. at 16–18].

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963))("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court.  *Craig v. Chater*, 76

4

F.3d 585, 589 (4th Cir. 1996); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision).    Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *See Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012); *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano,* 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).    Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'"    *Vitek  v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)).    Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose."    *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g).    *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir.

1991) (unpublished table decision).  To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim. *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled).   Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four is usually the proper course to allow the Commissioner to explain the basis for the decision or for additional investigation. *See Radford v. Comm'r*, 734 F.3d 288, 295 (4th Cir. 2013) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *see also Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand.").  After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction.  *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g). A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[3] With remand under sentence six, the parties must return to the court after remand to file modified findings of fact.

---

[3]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence. *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152, 2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107, 2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992). Further, the Supreme Court of the United States has not suggested *Borders'* construction of § 405(g) is incorrect. *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990). Accordingly, the Court will apply the more stringent *Borders* inquiry.

*Melkonyan*, 501 U.S. at 98. The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings. *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a disability. 42 U.S.C. § 423(a). "Disability" is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.    The Five Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims). The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the

claimant from having substantial gainful employment. 20 C.F.R. § 404.1520. Through the fourth step, the burden of production and proof is on the claimant. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). The claimant must prove disability on or before the last day of her insured status to receive disability benefits. *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969). If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience. *Grant*, 699 F.2d at 191. If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary. 20 C.F.R. § 404.1520(a); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A.    *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. § 404.1572(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* § 404.1572(b). If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity. *Id.* §§ 404.1574–.1575.

### B.    *Severe Impairment*

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. *See id.* § 404.1521. When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect

9

of all of the claimant's impairments.  42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a

disability claimant as a whole person and not in the abstract, having several hypothetical

and isolated illnesses.  *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that,

when evaluating the effect of a number of impairments on a disability claimant, "the

[Commissioner] must consider the combined effect of a claimant's impairments and not

fragmentize them").  Accordingly, the ALJ must make specific and well-articulated findings

as to the effect of a combination of impairments when determining whether an individual

is disabled.  *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or

her evaluation of the combined effects of the impairments.").   If the ALJ finds a

combination of impairments to be severe, "the combined impact of the impairments shall

be considered throughout the disability determination process."  42 U.S.C. § 423(d)(2)(B).

### C.    *Meets or Equals an Impairment Listed in the Listings of Impairments*

If a claimant's impairment or combination of impairments meets or medically equals

the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration

requirement found at 20 C.F.R. § 404.1509, the ALJ will find the claimant disabled without

considering the claimant's age, education, and work experience.  20 C.F.R. § 404.1520(d).

### D.    *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the

statute's focus on the functional capacity retained by the claimant."  *Pass v. Chater*, 65

F.3d 1200, 1204 (4th Cir. 1995).  At this step of the evaluation, the ALJ compares the

claimant's residual functional capacity[4] with the physical and mental demands of the kind of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work.  20 C.F.R. § 404.1560(b).

### E.    *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *See Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992); 20 C.F.R. § 404.1520(f)–(g).  To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids").  Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant nonexertional factors.[5]  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *see also Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving exertional limitations).  When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines.  *Gory*, 712 F.2d at 931. In such a case, the Commissioner must use a vocational expert to establish the claimant's

---

[4]Residual functional capacity is "the most [a claimant] can still do despite [his] limitations."  20 C.F.R. § 404.1545(a).

[5]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs.  20 C.F.R. § 404.1569a(a).  A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands.  *Id.* Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing.  § 404.1569a(c)(1).

ability to perform other work.  20 C.F.R. § 404.1569a; *see Walker*, 889 F.2d at 49–50 ("Because we have found that the grids cannot be relied upon to show conclusively that claimant is not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy.").  The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform."  *Walker*, 889 F.2d at 50.  For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments."  *Id.* (citations omitted).

## II.     Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  The ALJ is required to inquire fully into each relevant issue.  *Snyder*, 307 F.2d at 520.  The performance of this duty is particularly important when a claimant appears without counsel.  *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980).  In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Id.* (internal quotations and citations omitted).

## III.    Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion, 20 C.F.R. § 404.1527(c).  Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. § 404.1527(c)(2).  An ALJ determination coming

down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways. *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986). Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. 20 C.F.R. § 404.1527(d). However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. *Id.*

## IV.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 404.1517; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986). The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability. 20 C.F.R. § 404.1517. Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. *Id.*

## V.    Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). In evaluating claims of disabling

14

pain, the ALJ must proceed in a two-part analysis. *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion). First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'" *Id.* (quoting *Craig*, 76 F.3d at 594). Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain." *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the Fourth Circuit, it is well established that "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs." *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. Indeed, the Fourth Circuit has rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges within the circuit a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v.*

*Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990). The Commissioner thereafter issued the

following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth
> Circuit (North Carolina, South Carolina, Maryland, Virginia and
> West Virginia), Social Security Ruling (SSR) 88-13, Titles II
> and XVI: Evaluation of Pain and Other Symptoms:
>
> ...
>
> **FOURTH CIRCUIT STANDARD:** Once an underlying
> physical or [m]ental impairment that could reasonably be
> expected to cause pain is shown by medically acceptable
> objective evidence, such as clinical or laboratory diagnostic
> techniques, the adjudicator must evaluate the disabling effects
> of a disability claimant's pain, even though its intensity or
> severity is shown only by subjective evidence. If an underlying
> impairment capable of causing pain is shown, subjective
> evidence of the pain, its intensity or degree can, by itself,
> support a finding of disability. Objective medical evidence of
> pain, its intensity or degree (i.e., manifestations of the
> functional effects of pain such as deteriorating nerve or muscle
> tissue, muscle spasm, or sensory or motor disruption), if
> available, should be obtained and considered. Because pain
> is not readily susceptible of objective proof, however, the
> absence of objective medical evidence of the intensity,
> severity, degree or functional effect of pain is not
> determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990). SSR 90-1p has since been

superseded by SSR 96-7p, which is consistent with SSR 90-1p. *See* SSR 96-7p, 61 Fed.

Reg. 34,483-01 (July 2, 1996). SSR 96-7p provides, "If an individual's statements about

pain or other symptoms are not substantiated by the objective medical evidence, the

adjudicator must consider all of the evidence in the case record, including any statements

by the individual and other persons concerning the individual's symptoms." *Id.* at 34,485;

*see also* 20 C.F.R. § 404.1529(c)(1)–(c)(2) (outlining evaluation of pain).

## VI.    Credibility

16

The ALJ must make a credibility determination based upon all the evidence in the record.  Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985). Although credibility determinations are generally left to the ALJ's discretion, such determinations should not be sustained if they are based on improper criteria.  *Breeden*, 493 F.2d at 1010 ("We recognize that the administrative law judge has the unique advantage of having heard the testimony firsthand, and ordinarily we may not disturb credibility findings that are based on a witness's demeanor.  But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

## APPLICATION AND ANALYSIS

**Relevant Medical History**

Plaintiff alleges disability due to chronic gastritis, anger issues, DDD, severe clinical depression, anxiety, severe clinical anxiety, and celiac disease.  [R. 206.]  Plaintiff represented he was on the following medications for his ailments: Flexeril (for muscle spasms and pain), Norco (for back pain), Wellbutrin (for severe depression) and Xanax (for anxiety). [R. 208.]

### *Mental Health Treatment and Dr. Chen's Opinions*

On October 22, 2008, Plaintiff presented himself to Piedmont Medical Center Emergency Department complaining of having a "'nervous breakdown' past 1 month" and indicating he had a history of anxiety.  [R. 342.]  Plaintiff relayed that he had recently moved to the area with his wife, and they were unable to get insurance because she was

17

pregnant. [R. 343.]  Plaintiff explained he had been taking medication from a friend and that "taking the Xanax is the only way he can feel like a person."  [*Id.*] Plaintiff said that he vomits every morning for about half an hour, cannot eat or sleep, and had difficulty functioning in life.  [*Id.*]  A review of systems ("ROS") resulted in negative findings. On physical exam, Plaintiff appeared anxious, unable to sit still, but in no apparent distress. [*Id.*] Plaintiff's abdomen was soft, non-tender and non-distended; on musculoskeletal exam, his strength was grossly within normal limits and there was no appreciable muscle atrophy.  [*Id.*] On neurologic exam, Plaintiff's motor cranial nerves were grossly intact and his extremity strength and sensation were grossly intact.  [*Id.*]  On psychiatric exam, Plaintiff was oriented to time, place and person, and exhibited grossly appropriate mood and affect.  [*Id.*]  A urinalysis showed marijuana use.  [*Id.*] Plaintiff was referred for a psych consult and started on Zoloft and Vistaril.  [R. 344.]  Plaintiff was ultimately discharged to his home.  [R. 350.]

Treatment notes from March 7, 2011, indicated Plaintiff presented to Dr. Tammy Chen ("Dr. Chen") at Piedmont Behavioral Medicine Associates ("Piedmont") on referral from Shilend Family Medicine for an initial psychiatric evaluation due to complaints of anger, depression, and anxiety.  [R. 294.]   Dr. Chen's treatment notes are hand written and barely legible; however, the portions that are legible indicate Plaintiff's mood was "angry and anxious;" his thought processes were linear; his memory was intact; and his judgment, insight and impulse control were all good.  [R. 296.]  Dr. Chen diagnosed Plaintiff on Axis I with anxiety disorder and major depressive disorder ("MDD").  [*Id.*]  The Axis III diagnoses are illegible.  [*Id.*]

18

Progress notes dated May 31, 2011, from Dr. Chen indicated Wellbutrin had helped Plaintiff but he still felt he needs more energy; Xanax has also helped and his wife reported that Plaintiff is a "new man." [R. 298.] Notes also indicated that "financial constraints" were an issue. [*Id.*] On mental status exam, Dr. Chen noted Plaintiff "still [had] anger issues" but that his thought process was goal directed; no psychosis in thought content; clear sensorium; normal volume/rate/tone of speech; oriented to person, place, date and time; and insight/judgment was good. [*Id.*] Dr. Chen referred Plaintiff to Stepping Stones Counseling noting his diagnosis of major depression and anxiety. [R. 299.]

Plaintiff saw Dr. Chen again on August 22, 2011. [R. 300.] Plaintiff reported Xanax was helping; he was reminded not to overuse, however. [*Id.*] On mental status exam, Plaintiff was euthymic, goal directed in thought process and showed no psychosis in thought content. [*Id.*] Plaintiff's sensorium was clear; speech normal; he was oriented to person, place date and time; and his insight/judgment were noted as good. [*Id.*]

On January 11, 2012, Plaintiff saw Dr. Chen indicating that he had recently found out he had celiac disease and that Xanax had helped. [R. 301.] Plaintiff indicated that he had a good morning and was not snapping at his kids. [*Id.*] On mental status exam, Plaintiff's mood was good, thought process goal oriented; no psychosis; sensorium clear; normal volume/rate/tone in speech; oriented to person, place, date and time; and good insight and judgment. [*Id.*] Plaintiff was assessed with MDD and anxiety. [*Id.*]

On April 4, 2012, Plaintiff presented to Dr. Chen as irritated, sad, and furious due to his rescue dog being hit by a car and dying in his arms. [R. 302.] Plaintiff also indicated that he was stressed by bills and kids, and stated that "[i]f I had to support my family, we'd die." [*Id.*] Plaintiff did not want to return to counseling because he did not believe it

helped. [*Id.*] On mental status exam, Plaintiff's mood was aggravated and his affect irritable; thought process was goal oriented; no psychosis in thought content; sensorium clear; speech normal in volume/rate/tone; and his insight and judgment were impaired. Plaintiff was again assessed with MDD and anxiety. [*Id.*]

On May 14, 2012, Dr. Chen wrote a letter indicating that Plaintiff has been a patient at her practice since March 7, 2011, after moving from Georgia, and that he has struggled with mood swings and anger management. [R. 306.] Dr. Chen wrote that Plaintiff has suffered from back pain and gastrointestinal disease (celiac) and has continued to be symptomatic even with medications and has been unable to work due to his mental and medical illnesses. [*Id.*] She further wrote that Plaintiff reported a long history of psychiatric illness and medication treatment since teenage years; and Plaintiff has a strong family history of mental illness. [*Id.*]

On September 7, 2012, Dr. Chen wrote a subsequent letter indicating Plaintiff has had "a long history of psychiatric illness with an extensive history of mental issues since his teenage years." [R. 316.] Dr. Chen also noted that Plaintiff "has a strong family history of mental illness." [*Id.*] Dr. Chen wrote that Plaintiff was referred to her in March 2011 due to uncontrolled anxiety and "nervous breakdowns" which caused him to lose his job in October 2008. [*Id.*] She noted that Plaintiff has "continued to suffer from severe mood swings, crippling anxiety, and anger outbursts," and that in July, he began treatment with a mood stabilizing medication (Lithium) that is typically used for treatment of bipolar disorder. [*Id.*] Dr. Chen indicated that Plaintiff has shown only partial response to the medication and remains unable to function in any work environment. [*Id.*]

Dr. Chen also opined that Plaintiff is suffering from disabling lumber degenerative joint disease and is unable to stand or ambulate for long periods; and that he requires potent pain medications and that these medications, with his psychiatric medicines, impair his ability to work safely. [*Id.*] Further, Dr. Chen opined that Plaintiff has been diagnosed with gastrointestinal disease that causes constant cramping abdominal pain and frequent emesis even with current medication treatment and diet modification. [*Id.*] In summary, Dr. Chen provided that it is her medical opinion that Plaintiff is unable to work in any capacity due to his continued mental and medical conditions, and that his medical symptoms can directly affect his mental stability and vice versa. [*Id.*]

Progress notes from Dr. Chen dated December 13, 2012, indicated that Plaintiff is under financial stress; that his wife is handling the bills and has gotten caught up, but they are arguing over spending. [R. 360–61.] Notes also indicated Plaintiff still suffers from severe back pain. [*Id.*] On mental status exam, Plaintiff's mood was noted as "stressed out", his thought processes goal directed; and this thought content showed no psychosis. [*Id.*] Plaintiff's sensorium was clear; speech normal; he was oriented to person, place, date and time; and his insight and judgment were fair. [*Id.*] Dr. Chen assessed plaintiff with MDD, Anxiety disorder, Bipolar II disorder (severe mood swings). [*Id.*] Plaintiff was referred to Palmetto Counseling. [R. 361.]

Progress notes dated March 6, 2013, indicated that Plaintiff's wife accompanied him on this visit because she worried he was not being completely honest with the examination and because he was still very labile. [R. 363.] Plaintiff indicated he ran out of Lithium for three days and noticed his depression increased and that he was back to being angry all the time. [*Id.*] Plaintiff's wife reported that Plaintiff is still not "baseline" and that she

21

worries from day to day what kind of mood he will be in. [*Id.*] Notes also indicated "unpredictable 'violent rages.'" [*Id.*] Dr. Chen noted that Plaintiff was recently diagnosed with IBS by a GI doctor, but that Plaintiff feels the medication only helps a little although he is not vomiting all the time. [*Id.*] On mental status exam, Plaintiff's mood was noted as angry; thought process goal directed; thought content with no psychosis; sensorium clear; speech normal; oriented as to person, place, date and time; and insight and judgment fair. [*Id.*] Dr. Chen noted that Plaintiff's assessment was Bipolar II and that his prior diagnosis had been MDD and anxiety disorder. [*Id.*] She also advised Plaintiff to call Palmetto Counseling immediately and to start counseling. [*Id.*]

On May 30, 2013, Plaintiff returned to Dr. Chen indicating he has been unable to obtain an appointment with Palmetto Counseling. [R. 364.] Plaintiff admitted he and his wife were still arguing over finances and that he was a compulsive shopper. [*Id.*] On mental status exam, Plaintiff's mood was noted as "not any better," thought process was goal directed, and no psychosis in thought content. [*Id.*] Plaintiff's sensorium was clear, speech was normal, and he was oriented as to person, place, date and time; his judgment, however, was poor. [*Id.*] Dr. Chen diagnosed Bipolar II, MDD, and anxiety disorder, and continued Wellbutrin, Lithium, and Xanax. [*Id.*]

On June 23, 2013, Plaintiff returned to a clinician at the Saluda Center and admitted to using marijuana daily, smoking "+/- one joint per day" for about a year. [R. 339.] Plaintiff reported he had no support system. [*Id.*] Plaintiff was ultimately assessed with Bipolar disorder and indicated Plaintiff could benefit from therapy focused on the sources of his anger, frustration, and anxiety. [*Id.*]

On June 27, 2013, Plaintiff presented to the Saluda Center for a clinical assessment. [R. 338.] Plaintiff complained of extreme anger which affected his relationship with his wife and anger which manifests itself physically. [*Id.*] Plaintiff relayed that he is a stay-at-home dad and that his wife is a large animal vet who works long hours. [*Id.*] Consequently, Plaintiff is left to care for the two children, a 4 ½ year old girl and 2 year old boy. [*Id.*] Plaintiff reported he had seen a counselor once and it did nothing for him. [*Id.*] He also reported seeing Dr. Chen for Bipolar disorder and anxiety. [*Id.*]

The evaluator found Plaintiff was oriented X3, had impaired short term memory but had no other cognitive impairment. [*Id.*] The evaluator recorded the results of the evaluation as follows:

*no impact* in the following areas:

* elimination disturbance
* pyschomotor retardation
* phobias
* binging/purging
* laxative/diuretic abuse
* anorexia
* paranoid ideation
* circumstantial/tangential
* loose associations
* delusions
* hallucinations
* sexual dysfunction

* *mild impact* on quality of life but no significant impairment in day to day functioning in the following areas:

* sleep disturbance
* low energy

* *moderate or significant impact* on quality of life and/or day to day functioning in the following areas:

* depressed mood

> > \*      appetite disturbance
> > \*      poor concentration
> > \*      generalized anxiety
> > \*      panic attacks (had)
> > \*      obsessions/compulsions
> >
> > \*      *severe or profound impact* on the quality of life and day to day functioning in the following areas:
> >
> > > \*      agitation
> > > \*      lability
> > > \*      irritability
> > > \*      aggressive behavior
> > > \*      conduct problems
> > > \*      oppositional behavior

[*Id.*]

On August 20, 2013, Plaintiff returned to Dr. Chen and admitted that counseling had actually helped a lot. [R. 366.]  Plaintiff reported, however, that his dog had to be put to sleep, his cat died in his arms, and that he and his wife were still having issues due to his anger although things are better now.  [*Id.*]  On mental status exam, Plaintiff was described as "moody" and that "people in general" make him angry.  [*Id.*] Plaintiff's affect was irritable, his thought processes were tangential and his thought content showed no psychosis.  [*Id.*] Plaintiff's sensorium was clear; speech normal; he was oriented as to person, place, date and time; and his judgment and insight were fair.  [*Id.*]  Plaintiff was diagnosed with Bipolar II disorder.  [*Id.*]

On October 1, 2013,  Mark Meachem, LISW-CP ("Meachem") of the Saluda Center completed a form indicating it covered information from June 27, 2013, through September 26, 2013, a total of 6 sessions, and indicating that Plaintiff's emotional functionality is abnormal in that he exhibits extreme anger reactions.  [R. 340.]   Meachem indicated Plaintiff's prognosis is guarded, and also notes that "MHP does not make work status

recommendations as described in therapist's consent/disclosure statement." [*Id.*]    A check-box form indicated that present concerns included: severe depressed mood, marital stress, relational problems with his spouse and friends, and anger management problems. [R. 341.]

On November 13, 2013, Plaintiff returned to Dr. Chen reporting that, while he feels he has improved, he still has problems with anger. [R. 367.] Plaintiff reported feeling good when he fights. [*Id.*] Plaintiff was again diagnosed with Bipolar II disorder, and continued on Xanax, Wellbutrin, and Lithium.

On March 12, 2014, Dr. Chen wrote a letter stating that, based on her treatment of Plaintiff since March 7, 2011, and Plaintiff's extensive history of psychiatric illness and his treatment with rather high dose combinations of medications, he remains unable to function in any work environment. [R. 380.] Dr. Chen also noted that Plaintiff suffers from disabling lumbar degenerative joint disease and is unable to stand or ambulate for long periods of time; and also requires high doses of medication for his chronic pain. [*Id.*] According to Dr. Chen, the combination of Plaintiff's psychiatric and pain medication completely impair his ability to work safely. Dr. Chen opined that Plaintiff is unable to work in any capacity and that forcing him to do so would compromise his safety and the safety of others. [*Id.*]

### *Back Pain Treatment*

On May 4, 2011, Plaintiff saw Dr. Ratko Vujicic ("Dr. Vujicic") of the V Pain Clinic regarding his lower back pain and mid-back pain, complaining of muscle spasms in the back. [R. 267.] Plaintiff reported that the onset of his back pain began 6-7 years earlier with low back pain radiating into the back of his right thigh and pain radiating into his ankle.

[*Id.*]  Plaintiff described the onset as gradual and moderate in severity.  [*Id.*]  Plaintiff also described the pain as dull and sharp, and aggravated by standing and relieved by rest. [*Id.*] Plaintiff also reported trying chiropractics, massages, and epidural steroid injections for relief.  [*Id.*]  On review of systems ("ROS"), Plaintiff's findings were positive for weakness and fatigue; back and neck pain; headache, tingling numbness, and weakness in the legs; abdominal pain; and high stress level.  [*Id.*] Plaintiff's findings were negative for weakness in the arms; being easily fatigued and having trouble sleeping; chest pain or leg edema; vomiting; serious depression; sleep disturbance; and suicidal ideation.  [*Id.*]

On physical exam, Dr. Vujicic noted that Plaintiff was well nourished and pleasant. [R. 268.]    Plaintiff was also found to have normal range of motion ("ROM") of the neck, no tenderness in the abdomen, and normal spine with poor posture with increased thoracic kyphosis.  [*Id.*]  Dr. Vujicic was also able to reproduce the low back pain Plaintiff complained of through palpation to the right/left SI joint.  [*Id.*]  Dr. Vujicic noted that Plaintiff's cranial nerves were within normal limits, sensory was normal; motor strength was normal bilaterally, coordination was normal, reflexes 2+, gait was normal and straight leg raises were negative. [*Id.*] On musculoskeletal exam, Plaintiff's upper and lower extremity joints were found to be normal.  [*Id.*] Dr. Vujicic assessed Plaintiff with sacrolitis and scheduled him for a bilateral SI injection series.  [*Id.*]

On May 9, 2011, Plaintiff saw Dr. Vujicic regarding his lower back pain and mid-back pain, complaining of muscle spasms in the back.  [R. 265.]  Treatment notes indicated Plaintiff has a history of anxiety disorder, dermatitis, and gastritis. [*Id.*]  Plaintiff underwent a sacro-Iliac joint steroid injection bilateral and was advised to begin Flexeril medication. [*Id.*]  On July 5, 2011, Plaintiff was seen by Dr. Vujicic again regarding his lower back pain.

26

[R. 263.] Treatment notes also indicated that muscle relaxers are helping and that Plaintiff needs a new prescription of Flexeril. [*Id.*] Plaintiff underwent a sacro-Iliac joint steroid injection bilateral. [*Id.*]

On February 17, 2012, Plaintiff presented to Dr. William Lehman ("Dr. Lehman") at Carolina Orthopaedic Surgery Associates, P.A. ("Carolina Orthopaedic") with a complaint of lumbar spine pain with the onset of pain gradually occurring in a persistent pattern for twenty (20) years. [R. 286.] Plaintiff described the course of pain as recurrent and the pain as moderate. [*Id.*] A ROS indicated no abdominal pain, change in bowel habits, difficulty swallowing or heartburn; and no change in sleep pattern or mood changes. [R. 287.] Dr. Lehman noted definite tenderness about the lower back with some limitation in mobility; normal motor, sensory and reflex exam; gait reciprocal heel to toe; normal peripheral pulses and no pathologic reflexes. [R. 288.] Dr. Lehman also indicated his review of records from Dr. Vujicic regarding injections in May, June, and July of 2011 which did not offer any substantial relief. [*Id.*]

On February 27, 2012, Plaintiff underwent an MRI of the lumbar spine by Dr. Lehman due to pain radiating to his legs. [R. 285.] MRI findings, as read by Dr. Geoffrey Gilleland ("Dr. Gilleland") indicated that T11 hemangioma was incidentally noted; marrow signal was otherwise unremakable; and there was no malalignment. [R. 285.] Disc space narrowing at L4-5 and L5-S1 was present, however. [*Id.*] Conus and visualized aorta were intact; and L1-2, L2-3, and L3-4 were noted to be intact. [*Id.*] L4-5 was noted to have a central disc protrusion that mildly and moderately narrowed the lateral recesses; and neural foramen were intact. [*Id.*] L5-S1 is noted to have a central small disc bulge that mildly narrowed the right lateral recess; and T2 signal at the posterior disc space at L5-S1

27

and L4-5 were consistent with annular ligament tears.  [*Id.*]  Dr. Gilleland's impression included: posterior disc protrusion at L5-S1 possibly affecting the right S1 nerve root at the canal; and posterior disc protrusion at L4-5 without definite nerve impingement.  [*Id.*]

On February 29, 2012, Plaintiff saw Dr. Pete J. Menkhaus (" Dr. Menkhaus") of Carolina Orthopaedic, for an epidural steroid injection with fluoroscopy.  [R. 282–83.]  A ROS indicated no abdominal pain, change in bowel habits or heartburn; and no mood swings or unusual behavior.  [R. 283.]  Treatment notes indicated Plaintiff's preoperative and post operative diagnosis as radiculitis, lumbar or thoracic, NEC.  [*Id.*]  Dr Menkhaus indicated that Plaintiff tolerated the procedure well and recovered uneventfully.  [*Id.*]

On March 14, 2012, Plaintiff presented to Dr. Menkhaus for a second epidural steroid injection with fluoroscopy.  [R. 277.]  Treatment notes indicated Plaintiff reported 30%-40% improvement in his pain from the first injection with the first eight days providing better relief before the return of some of his discomfort.  [*Id.*]  Dr. Menkhaus noted that Plaintiff's reflexes were intact and Plaintiff ambulated without assistance and with no motor deficits.  [*Id.*]  Treatment notes indicated Plaintiff has a history of anxiety and depression, as well as musculoskeletal fractures.  [*Id.*]   A ROS indicated Plaintiff has no abdominal pain, change in bowel habits or heartburn; and no mood swings or unusual behavior.  [R. 278.]   Treatment notes indicated Plaintiff tolerated the procedure well and recovered uneventfully.  [R. 279.]  On March 28, 2012, Plaintiff was seen by Dr. Menkhaus for a third epidural steroid injection with fluoroscopy.  [R. 272–73.]  Treatment notes indicated Plaintiff has had minimal relief from his back pain and that he continues to care for his children which aggravates his pain.  [*Id.*]

In the letter dated May 10, 2012, Dr. Lehman stated that, in addition to suffering from anxiety, depression, and celiac disease, Plaintiff "remains disabled from any substantial physical activity for several problems including low back discogenic pain." [R. 304.] Dr. Lehman also stated that Plaintiff's MRI documents disk abnormalities at L4-5 and L5-S1, particularly at L5-S1 where there may be some nerve impingement.  [*Id.*]  Dr. Lehman explained that problems with Plaintiff's back relate to myofascial process with tightness and spasm which has not responded to physical therapy, epidural steroid injections, sacroiliac joint injections or pain management.  [*Id.*]  As a result, Dr. Lehman opined that Plaintiff is significantly limited in his activity, likely functioning at a light or sedentary work level of activity; and is unable to return to heavy work which would aggravate his back problems, increase his chronic pain syndrome, and possibly adversely impact his underlying psychological and emotional difficulties.  [*Id.*]

On September 11, 2012, Plaintiff presented to Dr. David Lewis ("Dr. Lewis")  at Carolina Medical Center University for a new pain evaluation.  [R. 319–20.]   Plaintiff described his pain level as an 8/10, sharp, stabby, dull, achy, constant, worse with standing, and better with his wife walking on his back.   [*Id.*] Plaintiff complained of numbness, tingling, pins, needles, radiating down the right. [*Id.*] Dr. Lewis noted Plaintiff's medical history was significant for anxiety, bipolar and gastritis. [*Id.*]  A twelve point review was conduction during the ROS and was determined to be negative as per Plaintiff's history of present illnesses ("HPI").  On physical exam, Dr. Lewis noted Plaintiff's abdomen was soft, non-tender, non-distended with bowel sounds x4. [*Id.*] On cervical exam, Plaintiff had adequate flexion and extension; thoracic exam was negative; and lumbar exam showed tenderness to palpation throughout the lumbar region, adequate flexion with pain,

and limited extension.  [*Id.*]  Left and right rotation with facet loading was positive; there was mild tenderness to palpation in the SI region; and straight leg raise was positive on the right.  [*Id.*]  Dr. Lewis diagnosed lumbar radiculopathy, lumbar spondylosis, and sacroiliitis. [R. 320.]  Dr. Lewis scheduled Plaintiff for a lumbar epidural steroid injection and started him on Gabapentin, Nucynta, and Flexeril.  [*Id.*]  Plaintiff was scheduled to return for a repeat lumbar epidural steroid injection in a month, a diagnostic lumbar facet if needed, and a diagnostic SI work-up.  [*Id.*]

Plaintiff returned to Dr. Lewis on September 18, 2012, on follow up and for an epidural steroid injection.  [R. 321.]  Plaintiff rated his pain level at a 6/10, sharp, stabby, dull, achy, constant, worse with movement and better with medication.  [*Id.*] Plaintiff also complained of numbness, tingling, pins, and needles radiating to his right foot.  [*Id.*] A twelve point ROS was negative as per HPI.  [*Id.*]  Dr. Lewis noted that if Plaintiff does not get relief from the lumbar epidural steroid injection, then they will proceed with a diagnostic facet work-up at the next visit.  [*Id.*]  Operative notes indicated Plaintiff tolerated the procedure well.  [R. 325.]

Plaintiff returned to Dr. Lewis on October 16, 2012, for a second lumbar epidural steroid injection.  [R. 328.]  Plaintiff reported greater than 50% relief from the first injection, rating his pain level at a 4/10, sharp, stabby, dull, achy, constant, worse with movement and better with medication.  [*Id.*]  Plaintiff admitted to numbness, tingling, pins, needles and burning radiating down both legs.  [*Id.*]  Again, a 12-point ROS was negative as per the HPI.  [*Id.*]  Operative notes indicated Plaintiff tolerated the procedure well.  [R. 329.]

Plaintiff returned to Dr. Lewis on November 13, 2012, for a third steroid injection reporting a 10-20% relief of pain for 5-6 days and rating his pain at a 8/10, sharp, stabby,

30

dull, achy pain that is constant, worse with activity and better with the medication he is currently on. [R. 330.] Plaintiff did have tenderness to palpation in his lumbar region with limited flexion and bilateral positive facet loading. [*Id.*] Plaintiff indicated that he was feeling so good from the first injection that he increased his activity level and Dr. Lewis suspected that this increased activity, coupled with deconditioning, is what may have exacerbated Plaintiff's pain and make his last procedure not as productive. [*Id.*] Surgical notes indicated Plaintiff tolerated the procedure well. [R. 331.]

On December 11, 2012, Plaintiff returned to Dr. Lewis for a scheduled bilateral L3-4, L4-5 and L5-S1 diagnostic faced injection. [R. 332.] Plaintiff complained of back pain at a 8/10 described as sharp, stabby, dull, achy, constant, worse with nothing he can identify and better with nothing he can identify. [*Id.*] Plaintiff reported he was not having numbness, tingling, pins, needles or burning radiating down his legs. [*Id.*] Surgical notes indicate Plaintiff tolerated the procedure well. [R. 335.]

### *Gastrointestinal Issues*

On October 13, 2010, Plaintiff presented to Piedmont Medical Center with complaints of abdominal pain. [R. 355.] Supine and erect views of the abdomen demonstrated no small bowel distention, no obstruction or free intraperitoneal air, no suspicious calcifications, and no abnormal soft tissue densities. [*Id.*] Plaintiff was seen at Catawba Gastroenterology on October 14, 2010, by Dr. Vimal P. Amin ("Dr. Amin") with complaints of pain in the mid-upper abdomen for a few months. [R. 307.] Plaintiff described the pain as recurrent but more constant; worse after meals; but with no radiation to back or either quadrants. [*Id.*] Treatment notes indicated there is no excessive use of NSAIDs, and notes a history suggestive of melena and anemia; weight loss of 20 pounds;

31

and some nausea with vomiting which is better with Zoftran. [*Id.*] On physical exam, all findings were normal. [*Id.*]

On January 24, 2011, Plaintiff returned to Dr. Amin for follow up on his episgastric pain. [R. 310.] Treatment notes indicated that the results of Plaintiff's upper GI endoscopy or EGD (esophagogastroduodenoscopy) on November 2, 2010 [*see* R. 356[6]], showed a small hiatal hernia and mild superficial chronic inactive gastritis. [*Id.*] During a ROS, treatment notes indicated Plaintiff denied any muscle pain, joint pain, joint swelling, back pain, difficulty walking, headaches, tingling, numbness, weakness, anxiety, depression or mood disorders. [R. 310.] On physical exam, Dr. Amin noted normal appearance of the abdomen, that it was soft and non-tender with no rigidity or organomegaly, not palpable mass, no ascites, normal bowel sounds and normal hernia sites. [*Id.*]

On April 15, 2011, Plaintiff underwent a CT of the abdomen with contrast ordered by Dr. Amin. [R. 358.] No obstructive or inflammatory changes were identified in the gastrointestinal tract; and no gross abnormality of the visualized skeleton was identified with the exception of the prominent vertebral body hemangioma within T11. [*Id.*] Dr. Amin concluded that the etiology of Plaintiff's abdominal pain was not elicited by this exam and that clinical correlation is recommended. [R. 359.]

On April 20, 2011, Plaintiff returned to Dr. Amin regarding his episgastric or abdominal pain. [R. 312.] Treatment notes indicated that on January 24, 2011, Plaintiff reported having some burning pain and rectal bleeding but no vomiting or weight loss. [*Id.*]

---

[6]Notes from the EDG indicated Plaintiff's final diagnoses included: moderate chronic active gastritis, status post biopsy for Helcobacter pylori; and small hiatal hernia, but no evidence of ulcerations, status post biopsy. [R. 356.]

On this visit, Plaintiff reported having another episode of pain and nausea with burning epigastric pain, possibly stress related. [*Id.*] Treatment notes also indicate that a CT scan on April 15, 2011, was normal except for mild atrophy of the pancreas. [*Id.*] During a ROS, Plaintiff denied any muscle pain, joint pain, joint swelling, back pain, difficulty walking, headaches, tingling, numbness, weakness, anxiety, depression or mood disorders. [*Id.*] On physical exam, Plaintiff's abdomen was normal in appearance, soft and non-tender, no rigidity or organomegaly noted, no palpable mass, no ascites, with normal bowel sounds and normal hernia sites. [R. 313.]

On May 31, 2012, Dr. Amin wrote a letter certifying that Plaintiff had been a patient of the practice since October 14, 2012, and had undergone several different tests including EGD with biopsies, CT scan of the abdomen, and lab work. [R. 308.] According to Dr. Amin, Plaintiff's symptoms have persisted and he has referred him to tertiary care for further evaluation. [*Id.*]

On July 3, 2012, Plaintiff saw physician assistant Amber Browning, PA-C ("Browning") with Carolina Digestive Health Associates ("CDHA") on follow up for his abdominal pain, bright red blood ("BRB") from the rectum, and nausea. [R. 368.] Plaintiff reported going 8-9 days without a bowel movement and then taking ex-lax to become regular resulting in BRB in his stools. [*Id.*] Plaintiff's physical and psychiatric exams resulted in normal findings. [R. 369.] On July 23, 2012, Plaintiff saw Dr. Michael Gaspari ("Dr. Gaspari") of CDHA to undergo an EGD (esophagogastroduodenoscopy) with biopsy and a Colonoscopy with biopsy. [R. 370.] The EGD findings were normal. [R. 371.] The colonoscopy findings were also normal with the exception of medium internal hemmorrhoids noted on retroflex view. [*Id.*]

33

On November 13, 2012, Plaintiff saw physician assistant Browning again on follow up. [R. 372.] Plaintiff reported he had been doing well on Librax until recently when he started having knife-like pain in his abdomen which spreads diffusely. [*Id.*] Browning also noted Plaintiff was very "edgy and anxious" during this appointment visit with tangential thought process. [*Id.*] Plaintiff's physical exam resulted in normal findings and, on psychiatric exam, Plaintiff was oriented to person, place and time with normal mood and affect. [R. 373.] Browning indicated that Plaintiff's abdominal pain was likely irritable bowel syndrome (IBS) related and that they would try Bentyl 2-3 times daily. [R. 372.]

On February 1, 2013, Plaintiff saw Dr. Nayan Patel ("Dr. Patel") with CDHA complaining of alternating diarrhea/constipation, nausea, and abdominal pain that with worse with bowel movements. [R. 374.] Plaintiff's physical exam resulted in normal findings and, on psychiatric exam, Plaintiff was oriented to person, place and time with normal mood and affect. [R. 375.] Dr. Patel started Plaintiff on Amitripyline and ordered Zoftran ODT. [R. 374.] On March 5, 2013, Plaintiff returned to Dr. Patel complaining of a flare in symptoms, causing Dr. Patel to suspect inflammatory bowel disease ("IBD"). [R. 376.] Plaintiff reported feeling better until 2-3 days ago, and that his appetite was poor, he was experiencing epigastric burning, associated nausea, but no vomiting. [*Id.*] Dr. Patel noted prior testing was negative for celiac and IBD by Prometheus testing. [*Id.*] Plaintiff's physical exam resulted in normal findings and, on psychiatric exam, Plaintiff was oriented to person, place and time with normal mood and affect. [R. 377.] Dr. Patel increased Plaintiff's dosage of Amitripyline to 50 mg QHS. [R. 376.]

On November 20, 2013, Plaintiff was seen on follow up for IBS and rectal bleeding. [R. 378.] Plaintiff reported less severe generalized abdominal pain being an Amitripyline,

34

Dicyclomine and Librax.  [*Id*.] He also reported BRB for the last two weeks with each bowel movement.  [*Id*.]  Again, Plaintiff's findings on physical and psychiatric exam were normal. [R.  379.]

**Plaintiff's Testimony at the ALJ Hearing**

Before the ALJ, on January 30, 2014, Plaintiff testified that he could drive no more than 15 minutes before his foot begins tingling all the way up his sciatic nerve to his back. [R. 41.] He also testified that he received help from his mother or mother-in-law during the day with the kids due to his back pain.  [*Id*.]  Plaintiff testified that he spends his days laying on the wood floor and trying to do stretches the best he can.  [R. 45.] Plaintiff also testified to feeding the dogs [R. 48], cleaning off the counters, sweeping the kitchen [R. 49.], and trying to do the exercises he has been given such as touching his toes, which does take slight pressure off his sciatic nerve on the right  [R. 50].

Plaintiff testified that his back pain goes down his leg due to his sciatic nerve and that the pain is  like "you've got a knife in...your butt bone, and then kind of like a slicing feeling down the back of [his] knee." [R. 55.]  Plaintiff testified that the pain was dull.  [*Id*.] Plaintiff also testified that he was diagnosed with a form of IBS called Crohn's disease and is being treated for the same.  [R. 46.]

When asked about gaps in his mental health treatment, Plaintiff explained that "[b]ecause our insurance has to come back around, and it would cost me $82 per visit...". [R. 42.]  Plaintiff further explained that he had to wait until 2011 when his wife finally bought private insurance.  [R. 43.] He also explained that they had to pay a deductible before insurance would kick in requiring him to pay $82 per visit, which he could not afford.  [*Id*.]

Plaintiff testified that his main problem is his anger and depression, and that he has bouts of rage about twice a day. [R. 51.] Plaintiff testified that he does not yell at his wife or kids during his bouts of rage, but he has to "go somewhere by himself to release it" so that he does not scare his family; he goes somewhere to scream and hit a punching bag or whatever. [R. 52.] Plaintiff testified that he will at times be laughing and the next minute be a mess. [R. 53.] Plaintiff testified that he planned to resume counseling at Saluda Center in March or April. [R. 54.]

Plaintiff testified that, to deal with his anger, Dr. Chen has given him Xanax, Wellbutrin, and the maximum dosage of Lithium because of the way his bipolar switches so quickly. [R. 59.]

**The ALJ's Weighing of Dr. Chen's Opinions**

In evaluating the evidence of record provided by Dr. Chen, the ALJ noted in the RFC discussion as follows:

> Thereafter, the medical evidence of record shows that the claimant first sought psychiatric care with Tammy Chen, M.D., on March 7, 2011, after going without mental health treatment since his purported "nervous breakdown" in 2008. (Exhibit 3F). Dr. Chen's records document mental health treatment every 3 months from March 7, 2011, to April 4, 2012, with limited clinical findings of any functional consequence (some difficult to read). (Exhibit 3F/9, 11, 12). Like the claimant's abdominal complaints, above, I do not find objective support to suggest that the claimant's mental health problems result in more than minimal restriction on his ability to work. I have discussed this in further detail in Finding Three.
> . . .
>
> Additionally, while I considered the opinions of the claimant's psychiatrist, Dr. Chen, I do not give them weight with reference to the claimant's physical functioning.

In a letter dated May 14, 2012, Dr. Chen first opined that the claimant was unable to work due to his mental and medical illness (including his back pain and gastrointestinal disease (recently diagnosed celiac disease)). (Exhibit 5F).

In another letter dated September 7, 2012, Dr. Chen reiterated that the claimant remained unable to function in any work environment. (Exhibit 8F). Additionally, she opined that the claimant was unable to stand or ambulate for long periods secondary to disabling lumbar degenerative joint disease (DJD) requiring potent pain medications, which further impaired his ability to work safely. (Id.). She again concluded that the claimant was unable to work in any capacity due to his continued mental and medical conditions. (Id.).

I give Dr. Chen's opinions no weight, as she based her assessment in part on the claimant's physical condition, without any evidence of familiarity with the claimant's medical condition other than his subjective reports. There is simply no objective evidence which Dr. Chen could cite in support of her opinions pertaining to the claimant's ability to perform work-related physical activities.

Moreover, I note that the Dr. Chen's multiple statements to the effect that the claimant was "unable to work in any capacity" relate to the issue of disability, which is reserved to the Commissioner. (SSR 96-5p). As such, I give Dr. Chen's opinions no weight as they pertain to the claimant's physical RFC.

[R. 19, 22–23.]

**RFC Evaluation and Treating Physician Opinion**

Plaintiff argues the ALJ dismissed several of Plaintiff's impairments without adequate explanation and failed to properly consider Plaintiff's physical and mental impairments in combination. [Doc. 15 at 19–20.] Plaintiff also argues the ALJ failed to explain his consideration of the medical evidence and other evidence of record in explaining the RFC assessment. [*Id*. at 22.] Specifically, Plaintiff contends the ALJ failed

to adequately explain his rejection of the opinions of Dr. Chen, Plaintiff's treating physician. [*Id.* at 28–30.]

The Commissioner, on the other hand, argues that substantial evidence supports the ALJ's decision to discount Dr. Chen's opinion that Plaintiff's mental impairments prevented him from working. [Doc. 16 at 13.] The Commissioner also contends that, even if Plaintiff did have more significant mental limitations, the jobs identified by the vocational expert are all limited to unskilled work. [*Id.* at 16.]

The Court agrees with Plaintiff.

### *Discussion*

The Administration has provided a definition of RFC and explained what a RFC assessment accomplishes:

> RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work related physical and mental activities. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. . . .

SSR 96–8p, 61 Fed.Reg. 34,474–01, at 34,475 (July 2, 1996) (internal citation and footnotes omitted). The RFC assessment must first identify the claimant's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. 404.1545 and 416.945. *See id.* Only after this identification and assessment may

RFC be expressed in terms of the exertional levels of work: sedentary, light, medium, heavy, and very heavy. *Id.*   Additionally, the Administration has determined that in assessing RFC, the ALJ

> must consider only limitations and restrictions attributable to medically determinable impairments. It is incorrect to find that [a claimant] has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain, due to factors such as age or height, or whether the [claimant] had ever engaged in certain activities in his or her past relevant work (e.g., lifting heavy weights.) Age and body habitus (i .e., natural body build, physique, constitution, size, and weight, insofar as they are unrelated to the [claimant]'s medically determinable impairment(s) and related symptoms) are not factors in assessing RFC. . . .

*Id*. at 34,476.

To assess a claimant's RFC, the ALJ must consider all relevant evidence in the record, including medical history, medical signs, laboratory findings, lay evidence, and medical source statements. *Id*. at 34,477.   SSR 96–8p specifically states, "The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted ." *Id*. at 34,478.   In considering medical source opinions, such as treating physician opinions, the ALJ is obligated to evaluate and weigh these medical opinions "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist."  *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527).

Courts typically "accord 'greater weight to the testimony of a treating physician' because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Id.* (*quoting Mastro*, 270 F.3d at 178).  While the ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, *Craig*, 76 F.3d at 590, the ALJ must still weigh the medical opinion based on the factors listed in 20 C.F.R. § 404.1527(c).  The opinion of a treating physician is given controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  Additionally, Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

1996 WL 374188, at *4 (July 2, 1996).  However, not every opinion offered by a treating source is entitled to deference:

> Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is "disabled" or "unable to work," or make similar statements of opinions.  In addition, they sometimes offer opinions in other work-related terms; for example, about an individual's ability to do past relevant work or any other type of work.  Because these are administrative findings that may

40

> determine whether an individual is disabled, they are reserved
> to the Commissioner.  Such opinions on these issues must not
> be disregarded.  However, even when offered by a treating
> source, they can never be entitled to controlling weight or given
> special significance.

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see also* 20 C.F.R. §§ 404.1527(e),

416.927(e)(stating an ALJ does not have to "give any special significance to the source of

an opinion on issues reserved to the Commissioner," such as an opinion that the claimant

is disabled, the claimant's impairment or impairments meets or equals a listing, or the

claimant has a certain residual functional capacity).

    During the Step 2 discussion related to whether depression and anxiety were a

severe impairment, the ALJ determined that Plaintiff's mental impairments were nonsevere

because they did not meet listing criteria for severity. [R. 12–15.]  The ALJ adopted the

assessments of Dr. Craig Horn (May 8, 2012), Dr. Xanthia Harkness (May 21, 2012), and

Dr. Paula Kresser (September 4, 2012)[7] in finding that Plaintiff had "no restriction of

activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in

maintaining concentration, persistence or pace, and no episodes of decompensation." [R.

13.]  The ALJ concluded that, "[a]fter careful consideration of the complete record, I find

that, even though additional records have come in from the claimant's treating psychiatrist

---

[7]On remand, the ALJ should explain her consideration of Dr. Kresser's September 2012 finding that Plaintiff's mental health treatment was not "indicative of significant functional limitations or severe symptoms per treating source notes until April 2012.  The information provided by treating sources indicates that symptoms are severe enough to change medication.  Evidence is not sufficient to determine severity or degree of functional worsening since April 2012 as treating notes are not available for review or response to treatment is only given in general sense." [R. 315.] The ALJ was privy to treatment notes after this date but failed to address the perceived worsening of Plaintiff's symptoms as noted by Dr. Kresser.

and counselor, this evidence fails to establish more than mild limitation in the claimant's mental functioning." [*Id*.] The ALJ also concluded that from March 7, 2011, to April 4, 2012, although Plaintiff sought mental health treatment from Dr. Chen every three months, Plaintiff's clinical findings were minimal and his mental status examination results remained mostly normal and not supportive of any significant mental functional issues. [*Id*.] The ALJ rejected Dr. Chen's opinions that Plaintiff had severe mood swings, crippling anxiety, and anger outbursts because treatment records did not substantiate her assessments. [*Id*.] Further, the ALJ acknowledged that the limitations noted in evaluating whether Plaintiff's mental impairments met listing criteria are not a RFC assessment and that the mental RFC assessment used at Steps 4 and 5 of the sequential evaluation process requires a more detailed assessment. [R. 15.]

However, while the ALJ accounted for certain physical limitations in Plaintiff's RFC, the ALJ failed to provide the "more detailed assessment" of Plaintiff's mental impairments required in Steps 4 and 5 for an RFC determination and provided no sufficient discussion regarding limitations directed to Plaintiff's mental impairments. [R. 16.] During the RFC analysis, the ALJ discussed Plaintiff's physical and mental impairments and concluded that she found no "objective support to suggest that the claimant's mental health problems result in more than minimal restriction on his ability to work." [R. 17–19.] But, the ALJ never explained how those "minimal" restrictions were accounted for or accommodated by the RFC. And, in fact, the RFC did not contain any mental limitations.

The ALJ considered the opinions of Plaintiff's treating physician Dr. Chen and concluded that they were not entitled to weight with reference to Plaintiff's physical functioning because there was no evidence of familiarity with the Plaintiff's medical

condition other than his subjective reports. [R. 22.] With respect to Plaintiff's mental impairments, the ALJ merely concluded that Dr. Chen's "multiple statements to the effect that the claimant was 'unable to work in any capacity' relate to the issue of disability, which is reserved to the Commissioner." [R. 23.] Curiously, however, the ALJ gave great weight to the observation of the state agency medical consultants although she did not agree with their conclusions that Plaintiff could perform medium exertional work as "they did not have the benefit of a complete record or the opportunity to personally observe and inquire of Plaintiff regarding his condition." [R. 22.]

In undertaking review of the ALJ's consideration of a Plaintiff's treating sources, the court is mindful that the focus of its review is on whether the ALJ's opinion is supported by substantial evidence, as its role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589. Typically, the Administration accords greater weight to the opinion of treating medical sources because treating physicians are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir.1992).

As previously stated, if a treating physician's opinion does not merit controlling weight, the ALJ is to evaluate it using the factors outlined in 20 C.F.R. § 404.1527(c); *see* SSR 96–2p; *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006). However, the Fourth Circuit has not mandated an express discussion of each factor and courts in this district have held that "an express discussion of each factor is not required as long as the ALJ demonstrates that he applied the . . . factors and provides good reasons for his decision."

*See Hendrix v. Astrue*, No. 1:09-cv-1283-HFF, 2010 WL 3448624, at *3 (D.S.C. Sept.1, 2010); *see also* § 404.1527(c)(2) (requiring ALJ to give "good reasons" for weight given to treating source's opinion).   Consequently, a district court will not disturb an ALJ's determination as to the weight to be assigned to a medical opinion, including the opinion of a treating physician, "absent some indication that the ALJ has dredged up 'specious inconsistencies' ... or has not given good reason for the weight afforded a particular opinion."  *Craft v. Apfel*, 164 F.3d 624, 1998 WL 702296, at *2 (4th Cir.1998) (internal citation omitted).

As an initial matter, the Court notes that the ALJ's decision to give Dr. Chen's opinions "no weight" appears to contradict the agency's expressly stated approach to weighing the opinions of treating physicians.  According to Social Security Ruling 96-2p:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96-2p (emphasis added).  However, courts have found that "an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings."  *Wireman v. Barnhart*, C/A No. 2:05CV00046, 2006 WL 2565245, at *8 (W.D.Va. 2006); *see also Bishop v. Comm'r*, 583

44

F. App'x 65, 67 (4th Cir. 2014) (affirming ALJ's decision to afford no weight to the treating physician's opinion); *Dellinger v. Colvin*, No. 6:14-cv-1150-DCN, 2015 WL 5037942, at *8–9 (D.S.C. Aug. 26, 2015) (affirming ALJ's decision to afford no weight to the treating physician's opinion where the ALJ gave specific reasons for the weight given to the treating source's medical opinion, reasons that were supported by the evidence in the case record).

In this case, the Court is unable to find that the specific rationale used by the ALJ in deciding to give "no weight" to Dr. Chen's opinions is supported by substantial evidence because the ALJ's decision left significant ambiguity as to the evidence the ALJ relied upon in completely disregarding the opinion. For instance, the ALJ decision stated, in a conclusory manner, that Dr. Chen's "multiple statements to the effect that the claimant was 'unable to work in any capacity' relate to the issue of disability, [] is reserved to the Commissioner." [R. 22.] Aside from this conclusion, however, there is no discussion related to the RFC determination by the ALJ of her consideration of Dr. Chen's findings that Plaintiff struggles with mood swings and anger management [R. 306]; suffers from Bipolar II disorder (severe mood swings), major depressive disorder and anxiety disorder [R. 361]; has an extensive history of psychiatric illness and is being treated with high dose combinations of medications making him unable to function in a work environment [R. 380]; or, that the combination of Plaintiff's psychiatric and pain medications impair his ability to work safely [R. 380]. The ALJ also failed to explain how she considered the June 23, 2013, assessment by the Saluda Center indicating that Plaintiff was moderately impacted in his ability to function in the areas of depressed mood, poor concentration and generalized anxiety; and was profoundly impacted in his ability to function due to agitation, lability, aggressive behavior and conduct problems. [R. 339.] The ALJ further failed to

45

address her consideration of Meachem's finding that Plaintiff's emotional functionality is abnormal in that he exhibits extreme anger reactions. [R. 340.]

And, while the ultimate determination of disability is reserved to the Commissioner, the ALJ is not entitled to ignore a treating physician's opinion regarding the same.  SSR 96–5p provides in part,

> Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is "disabled" or "unable to work," or make similar statements of opinions. In addition, they sometimes offer opinions in other work-related terms; for example, about an individual's ability to do past relevant work or any other type of work. Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner. Such opinions on these issues must not be disregarded. However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance.

Furthermore, although the ALJ is required to give specific reasons for the weight given to a treating physician's medical opinion, there is no conflicting medical evidence cited by the ALJ to justify ignoring Dr. Chen's opinions.  And, there is no contradictory evidence from an examining or treating physician put forth by the ALJ to justify completely ignoring the disability determination and functional assessment of Dr. Chen with respect to Plaintiff's mental impairment.  The ALJ appears simply to have ended her inquiry related to RFC mental limitations based on the fact that Dr. Chen spoke to an issue reserved to the Commissioner.

The Court finds particularly problematic the fact that the ALJ failed to mention: Plaintiff's Bipolar II disorder diagnosis; the findings of the Saluda Center evaluation from June 23, 2013; side effects associated with the high dose combinations of medications

46

Plaintiff was taking; or, Plaintiff's testimony that gaps in his mental health treatment were due to his inability to pay. And, while the ALJ may have accurately concluded that Plaintiffs's mental impairments did not dictate any additional limitations in the RFC, the Court cannot conclude that this determination is supported by substantial evidence in light of the lack of discussion in the ALJ's decision. Thus, the Court cannot conclude that the ALJ's RFC assessment and treatment of Dr. Chen's opinions are supported by substantial evidence.

**Plaintiff's Remaining Arguments**

Because this Court finds that the ALJ's failure to properly consider Dr. Chen's opinion in evaluating Plaintiff's RFC is sufficient basis to remand this matter back to the Commissioner, the Court declines to address Plaintiff's remaining allegations of error. On remand, however, the ALJ should address Plaintiff's remaining allegations of error, including Plaintiff's claim that the ALJ did not adequately consider the evidence in conducting the listing analysis under Listing 1.04[8]. The ALJ should also be mindful to discuss her consideration of all of Plaintiff's diagnosed impairments.

---

[8] To determine whether a claimant's impairments meet or equal a listed impairment, the ALJ identifies the relevant listed impairments and compares the listing criteria with the evidence of the claimant's symptoms. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (stating that, without identifying the relevant listings and comparing the claimant's symptoms to the listing criteria, "it is simply impossible to tell whether there was substantial evidence to support the determination"); *Beckman v. Apfel*, No. Civ.A. WMN–99–3696, 2000 WL 1916316, at *9 (D.Md. Dec.15, 2000) ("In cases where there is 'ample factual support in the record' for a particular listing, the ALJ must provide a full analysis to determine whether the claimant's impairment meets or equals the listing." (*quoting Cook*, 783 F.2d at 1172)). The law does not require all of the signs/symptoms to be present at the same time. *See Radford v. Colvin*, 734 F.3d 288, 293–94 (4th Cir. 2013).

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the Court recommends the Commissioner's decision be REVERSED pursuant to sentence four of 42 U.S.C. § 405(g), and the case is REMANDED to the Commissioner for further administrative action consistent with this Report and Recommendation.

IT IS SO RECOMMENDED.


s/Jacquelyn D. Austin
United States Magistrate Judge

July 27, 2016
Greenville, South Carolina

48